FILED

Feb 14 2017, 10:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Richard K. Shoultz
Neal Bowling
Lewis Wagner, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Mark K. Leeman
Logansport, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

School City of Hammond
District,

*Appellant-Defendant,*

v.

Chad Rueth,

*Appellee-Plaintiff*

February 14, 2017

Court of Appeals Case No.
45A03-1603-CT-450

Appeal from the Lake Superior
Court

The Honorable Diane Kavadias
Schneider, Judge

Trial Court Cause No.
45D11-1304-CT-64

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, School City of Hammond District (the District), appeals the trial court's entry of judgment pursuant to a jury verdict in favor of Appellee-Plaintiff, Chad M. Rueth (Rueth), on his claims of defamation and blacklisting.

We reverse.

# ISSUES

The District raises nine issues on appeal, two of which we find dispositive and which we restate as follows:

(1) Whether there is sufficient evidence to sustain the jury's verdict against the District for defamation; and

(2) Whether there is sufficient evidence to sustain the jury's verdict against the District for blacklisting.

# FACTS AND PROCEDURAL HISTORY

In 2004, Rueth was hired as a middle school history teacher at Gavit Middle/High School (Gavit), which is a school within the District in Hammond, Lake County, Indiana. Rueth also served as the girls' varsity basketball coach for the high school side of Gavit. In 2007, Rueth was asked to be the high school's assistant athletic director in addition to his teaching duties. That same year, the District hired Michelle Ondas (Principal Ondas) to serve as the assistant principal of Gavit. For a brief period in 2008, Principal Ondas acted as interim principal. During that time, she terminated the athletic

director and offered the position to Rueth. The athletic director position at Gavit was part time and based on a one-year contract, with a stipend of $9,182. Thus, in addition to his athletic director duties, Rueth continued to teach a few classes.

[5] When Rueth commenced his job as athletic director, he discovered that the school's athletic fund had been depleted. As such, he looked for ways to both raise funds and cut costs without any sacrifice to the student-athletes. Despite his success in restoring funds to the athletic account, Rueth had clashes with (then-assistant principal) Principal Ondas regarding the proper channels of communication and his conflicts with coaches and other faculty members. At the end of each academic year, the then-principal renewed Rueth's contract as athletic director.

[6] In June of 2011, Principal Ondas was promoted to principal. Shortly after assuming her new role, Principal Ondas met with Rueth to outline her expectations of him for the upcoming school year. As part of this meeting, Principal Ondas completed an evaluation form, noting several areas in which Rueth needed to demonstrate improvement, such as his level of enthusiasm and initiative, his relationship with students and colleagues, his respect for the channels of authority, and his effectiveness in communication. Principal Ondas also summarized goals for Rueth, which consisted of better promoting the school, communication, and flexibility. A follow-up meeting was scheduled for December 2011, but this meeting never occurred. Regardless, at that time, Principal Ondas contacted the District's central office to inform the necessary

administrators that she wanted to open up the athletic director position to other candidates at the expiration of Rueth's contract in June of 2012. Principal Ondas was advised to wait until the following spring to inform Rueth of this decision, and this information was not otherwise made available to the public.

[7] In the fall of 2011, and prior to Principal Ondas' decision to open up the athletic director job, Rueth discovered that his high school alma mater, Bishop Noll Institute (BNI)—a private, Catholic high school—was seeking candidates for its full-time athletic director position. He applied. BNI assembled an eight-person hiring committee (Hiring Committee), which included, in part: Colleen McCoy-Cejka (Principal McCoy-Cejka), BNI's principal; Andrew Trost (Trost), a BNI faculty member; Michael Whelan (Whelan), the vice president of BNI's Board of Limited Jurisdiction and an alumnus; Karl Repay (Repay), a BNI alumnus and sports coach; and Nora Kasprzycki (Kasprzycki), a member of the BNI Board of Limited Jurisdiction. When Rueth applied for the position, he requested that BNI not contact anyone at Gavit about his candidacy. Nevertheless, Principal Ondas eventually learned from her brother-in-law, a member of BNI's Board of Limited Jurisdiction, that Rueth had applied for the job at BNI. On one occasion thereafter, Principal Ondas inquired as to whether Rueth had been chosen for the position, but because her brother-in-law was not involved with the hiring process, he had no information to offer.

[8] BNI's Hiring Committee received more than forty resumes, which it whittled down to four potential candidates, including Rueth. The first round of interviews was conducted on March 9, 2012. Although the majority of the

Hiring Committee ranked Rueth within their top two choices for the position, others were not impressed by his performance. Ultimately, the Hiring Committee narrowed the field down to Rueth and one other candidate. According to Whelan, Rueth's alumnus status "probably got him the second interview." (Tr. Vol. II, p. 343). The two finalists were instructed to create a presentation for the Hiring Committee "as to what [they] saw the future of [BNI] athletics being, and kind of highlighting the ten[-]year work that we were going to do to bring [BNI] into [its] 100[-]year anniversary." (Tr. Vol. I, p. 71). The presentations were scheduled for April 19, 2012.

[9]   In addition to his coaching duties at BNI, Repay was employed as a firefighter for the City of Hammond. Principal Ondas' husband, Chris Ondas (Chris), was also a firefighter. Chris worked and socialized with Repay. At some point during BNI's hiring process, Repay casually asked for Chris' opinion of Rueth. Based on his personal observations of Rueth at various sporting events at Gavit, Chris stated, "Well, I don't think he's a real ball of fire." (Tr. Vol. I, p. 198). On a subsequent occasion, Chris mentioned to Repay that Rueth "was having to reapply for his position at Gavit." (Tr. Vol. II, p. 253). According to Repay, he shared this information with Principal McCoy-Cejka. Principal McCoy-Cejka recalled that Repay informed her "that [Rueth] was being let go from his current position." (Tr. Vol. II, p. 295). Principal McCoy-Cejka indicated that, with the exception of Trost, she did not discuss Rueth's status as Gavit's athletic director with the rest of the Hiring Committee. However, Trost stated

that prior to the second interview, the Hiring Committee had discussions about the fact that Rueth was no longer Gavit's athletic director.

[10] On the morning of April 19, 2012, the same day that Rueth was scheduled to make his presentation to the BNI Hiring Committee, Principal Ondas summoned Rueth to her office. Rueth "had a strong inclination as to what was going to happen," so he used his cell phone to record the meeting. (Tr. Vol. I, p. 81). Principal Ondas informed Rueth that she was "going to open up the athletic director's position" for the following school year because she "want[ed] to take it in a different direction." (Tr. Vol. I, p. 78). However, Principal Ondas told Rueth that he was "more than welcome" to reapply for the job. (Tr. Vol. I, p. 78). Later that evening, Rueth made his presentation to the BNI Hiring Committee, but it did not go "as well as [he] would have liked it to have gone" as he "was still reeling from what had happened earlier that day." (Tr. Vol. I, p. 84). Following his presentation, Rueth asked to speak privately with Principal McCoy-Cejka and Trost, at which time he informed them that he had just learned that he "was being let go from [his] position at Gavit as the athletic director." (Tr. Vol. I, p. 85).

[11] The following day, on April 20, 2012, Principal McCoy-Cejka sent the following email to members of the Hiring Committee:

> CONFIDENTIAL INFORMATION!!!!!!! He was put on planned action last summer and was told he did not satisfactorily fulfill the requirements that the administration was asking of him. How did we all find out about it [two] weeks ago, and he just learned about it yesterday? Can't explain that one. It's all fishy.

I'm afraid too many people in the BNI community became involved in advising us on choosing him and helping him to prepare for us. I don't know how a lot of information becomes public, but it does, and it almost always causes damage. I don't know how else to try to get to the truth without causing more damage for him at Gavit.

(Plaintiff's Exh. 11). Also that day, Whelan emailed the rest of the Hiring Committee as follows:

All,

I am troubled with trying to put a timeline together on the [Rueth] [athletic director] situation at Gavit. Part of me feels that our responsibility was to be confidential and maybe that was blown. Now, maybe [Rueth] blew that himself because he admitted he had people helping him so that could be the situation.
I am confused as to what happened at Gavit and when it actually happened. There definitely is a difference in [Rueth's] story and what we are hearing.

It is important to me to understand what really happened.

[Rueth] told [Principal McCoy-Cejka] and [another member of the Hiring Committee] that he was told that the [athletic director] job at Gavit would be advertised yesterday. I find the timing very unusual.
The rumor is however that he was told this [two] or [three] weeks ago??
Was he really?
Why would he lie?
Was he supposed to be told and then it didn't happen?

Someone is going to have to sit with [Rueth] and explain why he wasn't chosen at some point soon.

He is an alumn[us], his family will be influential in a capital campaign. This doesn't mean we had to hire him but it means that we need to treat him very fairly and the story we tell him needs to be very thought out.
We also all need to have the same story and be unanimous in our decision. We can[']t have people saying, well that wasn't my choice or that wasn't my vote. This is way too important.

It appears to me that there is some real bad blood at Gavit for sure.

(Plaintiff's Exh. 28).

[12] The Hiring Committee voted to recommend the hiring of the other candidate. Principal McCoy-Cejka was ultimately solely responsible for selecting the new athletic director, and she accepted the recommendation of the Hiring Committee. According to Principal McCoy-Cejka, the information about Rueth's position at Gavit did not influence her hiring decision, and he "was given a fair opportunity all the way up to the end, and was still a contender with another candidate up until the very end even though that gossip had been out there." (Tr. Vol. II, p. 308). On April 27, 2012, Principal McCoy-Cejka notified Rueth that he had not been selected as BNI's athletic director. Thereafter, in May of 2012, Rueth applied for the athletic director position at Gavit, but he was not re-hired.

[13] According to Rueth, he had a phone conversation with Whelan following the Hiring Committee's decision, during which Whelan informed him that he was not hired because of "the shit that [Principal Ondas] put out there about me."

(Tr. Vol. II, p. 433). Whelan also purportedly informed Rueth that Principal Ondas

> was in contact with the [H]iring [C]ommittee. [Whelan] told [Rueth] that he was mad, he was upset. [Whelan] used a lot of four letter words during the conversation. When [Whelan] talked to [Rueth], he was angry because he felt like the entire process was compromised. [Whelan] felt like they made an uninformed decision, an unfair decision.

(Tr. Vol. II, p. 433). Rueth further stated that Whelan explained that there was a "cloud of suspicion about when . . . [he was] fired at Gavit as the athletic director" and that Principal Ondas had advised the Hiring Committee that "you should not hire him." (Tr. Vol. II, p. 434).[1] Conversely, Whelan denied that he informed Rueth that the reason he did not get the job was based on information that Principal Ondas had communicated to the Hiring Committee. Rather, Whelan claimed that, although he acknowledged there were "a lot of rumors flying around out there[,]" he told Rueth

> that he didn't get the job because he didn't do a good job at his interviews, and there was people that called me and said—put in a good word for him and other people. And I said, "I'm just going to tell you [that] you didn't do a good job at the interview, and that's why I didn't vote for you, and if I were you, and I was going to go and get another job, this is some of the things I would do." That's what I told him.

---

[1] The District objected to the admission of Rueth's testimony regarding his telephone conversation with Whelan on grounds of hearsay. The trial court admitted the testimony only for the purpose of rebuttal.

(Tr. Vol. II, pp. 360-61). Furthermore, Principal McCoy-Cejka, Trost, Repay, and Kasprzycki all stated that there was no communication between the Hiring Committee and Principal Ondas or any other District employee, and Whelan indicated that he had never heard of Principal Ondas prior to the current proceedings. Similarly, Principal Ondas stated that she had no knowledge as to why anyone on the Hiring Committee would have had knowledge about the Gavit athletic director position.

[14] In addition, it appears that the Hiring Committee's decision to forego hiring Rueth resulted in some backlash within the BNI community. Principal McCoy-Cejka emailed members of the Hiring Committee, stating that

> she [that is, Principal McCoy-Cejka,] feels like we need to issue a public statement on what a crappy job [Rueth] did in his interview. She says really no one's putting two and two together. He got fired from one job, did not get hired for another, he's not awesome, people. He's also probably slandering [Principal Ondas] all over Hammond. What he said to us was mild compared to what he speaks freely and nonprofessional, I am sure.

(Tr. Vol. II, p. 363).

[15] On April 6, 2013, Rueth filed a Complaint for Damages and Demand for Jury Trial. In his Complaint, Rueth alleged claims of defamation and blacklisting against the District. On May 28, 2013, the District filed its Answer, denying Rueth's allegations. On December 7 through 10, 2015, the trial court conducted a jury trial. After Rueth rested his case-in-chief, the District moved

for judgment on the evidence. Outside of the presence of the jury, the trial court denied the District's motion, stating that it was very clear that

> there was information given to the [Hiring Committee] well in advance of . . . Rueth even knowing that his contract as the athletic director was not going to be renewed. It's also interesting that the very day of his second interview is when he found out from the principal of this fact, just as he was going in for his second interview. From that information, there's enough evidence where the jury can draw inferences if his employment status was going to change, and the only people that knew that were the central administration, principal, and the assistant principal, it's quite interesting that all of a sudden a group from another school was aware of it. The inference that can be drawn is either directly or indirectly that was communicated to those individuals.

(Tr. Vol. II, pp. 446-47). At the close of the evidence, the jury returned a general verdict in favor of Rueth and awarded him damages of $550,000. Thereafter, the trial court entered judgment in accordance with the verdict.

[16] On January 13, 2016, the District filed a Motion to Correct Error. The District claimed, in part, that Rueth "failed to present evidence on essential elements of his claim to support the judgment"; that Indiana's blacklisting statute "is inapplicable to any claim against the [District] as a matter of law and cannot support the basis of the verdict"; and that Rueth "failed to present probative evidence sufficient to support the jury's damages award." (Appellant's App. Vol. II, p. 35). On February 9, 2016, the trial court denied the District's Motion to Correct Error, finding that "[t]here was sufficient evidence presented to support the verdict of the jury in this case." (Appellant's App. Vol. II, p. 23).

The District now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

The District appeals from the trial court's denial of its Motion to Correct Error. We review a trial court's ruling on a motion to correct error for an abuse of discretion. *Newland Resources, LLC v. Branham Corp.*, 918 N.E.2d 763, 772 (Ind. Ct. App. 2009). It is an abuse of discretion if "the trial court's action is against the logic and effect of the facts and circumstances before it and the inferences which may be drawn therefrom." *Cox v. Matthews*, 901 N.E.2d 14, 21 (Ind. Ct. App. 2009), *trans. dismissed*. "The trial court's decision on a motion to correct error comes to us cloaked with a presumption of correctness and the appellant has the burden of showing an abuse of discretion." *Id.*

In its Motion to Correct Error, pursuant to Indiana Trial Rules 50 and 59, the District requested that the trial court vacate its judgment in favor of Rueth "and to enter judgment for [the District] on all claims." (Appellant's App. Vol. I, p. 35). Indiana's trial rules allow a party to move for judgment on the evidence in a motion to correct error. *See* Ind. Trial Rule 50(A)(4). When considering a motion to correct error, if the court "determines that prejudicial or harmful error has been committed," it "shall take such action as will cure the error." T.R. 59(J). In particular,

> [i]n reviewing the evidence, the court shall grant a new trial if it determines that the verdict of a non-advisory jury is against the weight of the evidence; and shall enter judgment, subject to the

provisions herein, if the court determines that the verdict of a non-advisory jury is clearly erroneous as contrary to or not supported by the evidence.

T.R. 59(J)(7). Similarly, the rule concerning judgments on the evidence provides:

> Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict.

T.R. 50(A). Despite the differing language in the rules governing motions for judgment on the evidence and motions to correct error, "both rules mandate that the motion be granted when there is insufficient evidence under the law to support a verdict." *Huff v. Travelers Indem. Co.*, 363 N.E.2d 985, 990 (Ind. 1977).

[20] When considering a motion for judgment on the evidence subsequent to a jury verdict, the trial court may not weigh the evidence and

> must view only the evidence favorable to the non-moving party and the reasonable inferences to be drawn from that evidence. The trial court may enter judgment only if there is no substantial evidence or reasonable inference to be adduced therefrom to support an essential element of the claim, *i.e.*, the evidence must point unerringly to a conclusion not reached by the jury.

*Id.* (Italics added). If there is relevant evidence that supports the verdict, a motion for judgment on the evidence is improper because the final

determination must be left to the fact-finder. *Id.* "Judicial economy is served by this view in that the trial court withdraws the case from the jury or enters a judgment notwithstanding the verdict whenever an appellate court would be compelled to find the evidence does not support a judgment." *Id.*

## II. *Defamation*

"The law of defamation was created to protect individuals from reputational attacks." *Hamilton v. Prewett*, 860 N.E.2d 1234, 1243 (Ind. Ct. App. 2007), *trans. denied.* Thus, defamation is defined as "that which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff." *Poyser v. Peerless*, 775 N.E.2d 1101, 1106 (Ind. Ct. App. 2002) (internal quotation marks omitted). In order to establish defamation, the plaintiff "must prove the existence of 'a communication with defamatory imputation, malice, publication, and damages.'" *Dugan v. Mittal Steel USA Inc.*, 929 N.E.2d 184, 186 (Ind. 2010) (quoting *Trail v. Boys & Girls Clubs of N.W. Ind.*, 845 N.E.2d 130, 136 (Ind. 2006)). A communication is "defamatory per se if it imputes: (1) criminal conduct, (2) a loathsome disease, (3) misconduct in a person's trade, profession, office, or occupation, or (4) sexual misconduct." *Hamilton*, 860 N.E.2d at 1243. When a communication is found to be defamatory per se, "damages are presumed even without proof of actual harm to the plaintiff's reputation." *Id.*

In this case, the District claims that Rueth failed to present any evidence at trial to support the essential elements of defamation. The District contends that the

only information that was communicated between the District and the Hiring Committee, albeit indirectly (*i.e.*, through Principal Ondas' husband, Chris), was that Rueth was going to have to reapply for the position of Gavit's athletic director. The District argues that such a statement is not defamatory; it is true; it was not published by the District; it was communicated to the Hiring Committee by Rueth himself; and it did not cause any damage to Rueth.

[23] "Whether a communication is defamatory 'depends, among other factors, upon the temper of the times [and] the current of contemporary public opinion, with the result that words, harmless in one age, in one community, may be highly damaging to reputation at another time or in a different place.'" *Id.* (alteration in original) (quoting *Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 452 n.6 (Ind. 1999)). In general, whether a communication is considered defamatory is a question of law for a court to decide. *Id.* However, it "becomes a question of fact for the jury if the communication is reasonably susceptible to either a defamatory or a non-defamatory interpretation." *Id.* "To impose liability for defamation, a *false* statement of fact is required." *Id.* (emphasis added) (citing *Journal-Gazette Co.*, 712 N.E.2d at 457). "In determining whether a defamatory meaning is possible, we test the effect that the statement is fairly calculated to produce and the impression it would naturally engender in the mind of the average person." *Id.*

[24] Here, the evidence clearly established that Principal Ondas intended to open up Gavit's athletic director position to other candidates at the end of Rueth's contract term. She informed the District's central administration office of her

decision in December of 2011 and was instructed to inform Rueth of the same the following spring (as Rueth's contract was set to expire on June 15, 2012). On April 19, 2012, Principal Ondas communicated to Rueth that his contract for athletic director would not be renewed at the end of its term because she "want[ed] to take it in a different direction" but that he was "more than welcome" to reapply for the job. (Tr. Vol. I, p. 78). Based on the truthfulness of this statement, it cannot support a defamation claim. *See Gatto v. St. Richard School, Inc.*, 774 N.E.2d 914, 924 (Ind. Ct. App. 2002) ("[T]ruth is a complete defense to defamation.").

[25] Rueth, however, directs our attention to the April 20, 2012 email from Principal McCoy-Cejka to the rest of the Hiring Committee, which stated:

> CONFIDENTIAL INFORMATION!!!!!!! He was put on planned action last summer and was told he did not satisfactorily fulfill the requirements that the administration was asking of him. How did we all find out about it [two] weeks ago, and he just learned about it yesterday? Can't explain that one. It's all fishy. I'm afraid too many people in the BNI community became involved in advising us on choosing him and helping him to prepare for us. I don't know how a lot of information becomes public, but it does, and it almost always causes damage. I don't know how else to try to get to the truth without causing more damage for him at Gavit.

(Plaintiff's Exh. 11). Rueth additionally cites the email sent by Whelan on the same day, which points out the discrepancy between when Rueth learned that he would no longer be Gavit's athletic director and when the Hiring Committee learned the same information. Whelan's email to the Hiring Committee also

noted that there was some "real bad blood at Gavit for sure." (Plaintiff's Exh. 28). Rueth contends that this information is false because there is no evidence that he was "on some sort of performance improvement plan or planned disciplinary action," and

> [t]here was no evidence [that] Rueth failed to meet the requirements of a "planned action" during the course of the prior school year. Rueth was never told that he failed to meet the terms of some formal planned action, nor was he told prior to April 19, 2015 [*sic*] that he was likely to lose his athletic director position because he failed to meet the requirements of a planned action.

(Appellee's Br. p. 27). Furthermore, Rueth asserts that such a communication is defamatory in nature because it "gave the distinct the [*sic*] impression to the Hiring Committee that Rueth was a bad athletic director, who was placed on a planned disciplinary action, failed to meet the requirements of the planned action, and carried some real 'bad blood' with those he worked with." (Appellee's Br. p. 28). Based on the fact that Whelan assumed there was "bad blood" between Rueth and Gavit, Rueth now asserts that the "information circulating among the Hiring Committee came directly from the District." (Appellee's Br. p. 30).

[26] We agree with Rueth that the email from Principal McCoy-Cejka includes statements that *could be* construed by a jury as defamatory.[2] Nevertheless, the District argues that "the record is devoid of any evidence whatsoever that anyone affiliated with the District ever even made a statement to the effect that . . . Rueth was on 'planned action,' let alone published such a statement to third parties." (Appellant's Reply Br. p. 8). As already mentioned, in order to prove a claim of defamation, "the plaintiff must show that the defamatory matter was 'published,' that is, communicated to a third person or persons." *Bals v. Verduzco*, 600 N.E.2d 1353, 1354 (Ind. 1992). We agree with the District.

[27] We must first note that, although we "indulge every reasonable presumption in favor of the legality of [a jury] verdict," we will overturn the verdict "if it is legally or logically inconsistent, contradictory, or repugnant." *Simon Prop. Grp., L.P. v. Brandt Const., Inc.*, 830 N.E.2d 981, 988 (Ind. Ct. App. 2005), *trans. denied*. Here, we are unable to identify any evidence from which it could be inferred that the District published any information to the BNI Hiring Committee that Rueth was on a "planned action" and failed to fulfill the administration's requirements. (Plaintiff's Exh. 11). Rueth argues that "[t]he only plausible source of this information was from the District itself" because it

---

[2] Although, as the District points out, "it is unclear from the single appearance of the phrase 'planned action' in the evidentiary record what [Principal] McCoy-Cejka intended the term to mean, or what the [Hiring Committee] understood it to mean. The phrase has no commonly understood meaning." (Appellant's Reply Br. p. 12). And although Rueth "suggests that the phrase is equivalent to 'performance improvement plan,' [which] implies that an employee has been disciplined[,]" there is no support for this interpretation in the record. (Appellant's Reply Br. p. 12).

"was specific, detailed, and related directly to Rueth's employment at the District." (Appellee's Br. p. 30).[3] Thus, he insists that "[i]t would be bizarre for such detailed and specific information about Rueth's employment to have been completely manufactured by an individual unaffiliated with the District." (Appellee's Br. p. 31).

[28] In turn, the District postulates that "[i]t is just as plausible that [Principal] McCoy-Cejka heard true information, that is, that . . . Rueth would have to reapply for the Gavit athletic director position, and added the 'planned action' comment herself, either through exaggeration or misunderstanding." (Appellant's Reply Br. p. 11). Similarly, emails circulated among the Hiring Committee members from Principal McCoy-Cejka and Whelan also suggest that information could have come from a number of other sources because "too many people in the BNI community became involved in advising us on choosing him and helping him to prepare for us" and that "maybe [Rueth] blew that [confidentiality] himself because he admitted he had people helping him so that could be the situation." (Plaintiff's Exhs. 11, 28).

---

[3] As to Rueth's contention that "Principal Ondas conceded that the only plausible source of the information that the Hiring Committee had received was an employee of the District[,]" we find that this is a mischaracterization of the evidence. (Appellee's Br. pp. 30-31). Principal Ondas testified that she informed the District's central administration office in December of 2011 that she wanted to open up the athletic director position to other candidates at the expiration of Rueth's contract. This is the only information that Principal Ondas conceded could have been communicated by an employee of the District, and, as established above, it is a factual statement and therefore not defamatory.

[29] The only evidence in the record regarding information about Rueth being transmitted from the District to the Hiring Committee is the factual statement that Repay learned from Principal Ondas' husband, Chris, that Rueth "was having to reapply for his position at Gavit." (Tr. Vol. II, p. 253). Repay testified that he shared this fact with Principal McCoy-Cejka and, thereafter, the remainder of the Hiring Committee also learned of it before even Rueth himself had been notified. Furthermore, all of the members of the Hiring Committee who testified, as well as Principal Ondas, indicated that there was no communication between the District and the Hiring Committee regarding Rueth. Absent some indicia of evidence that the District was informing third parties that Rueth was on a "planned action," the jury's verdict is based on speculation. (Plaintiff's Exh. 11).[4] Our court has previously stated that "[t]he failure of inference may occur as a matter of law when the intended inference can rest on no more than speculation or conjecture." *Northrop Corp. v. Gen. Motors Corp.*, 807 N.E.2d 70, 87 (Ind. Ct. App. 2004) (quoting *Hartford Steam Boiler Inspection & Ins. Co. v. White*, 775 N.E.2d 1128, 1133 (Ind. Ct. App. 2002), *trans. denied*), *trans. denied*. Accordingly, there is insufficient evidence to support a verdict for defamation.

---

[4] Rueth further contends that it could be inferred that Chris overheard phone conversations during which Principal Ondas "shared false information about Rueth with other administrators," which he subsequently shared with the Hiring Committee. (Appellee's Br. p. 32). This, too, is speculation in light of the fact that there is no evidence that Principal Ondas shared false information with any administrators, and the record indicates that the only information that Chris relayed to Repay was that Rueth was not a "real ball of fire" (based on Chris' personal observation rather than an opinion of the District) and that Rueth "was having to reapply for his position at Gavit." (Tr. Vol. I, p. 198; Tr. Vol. II, p. 253).

## III. *Blacklisting*

[30] The District also claims that Rueth failed to present evidence on the essential elements of his blacklisting claim. The relevant portion of the blacklisting statute, Indiana Code section 22-5-3-2, "create[s] a cause of action for damages resulting from a former employer engaging in blacklisting" and provides as follows:

> If any . . . company, partnership, limited liability company, or corporation in this state shall authorize, allow or permit any of its or their agents to black-list any discharged employees, or attempt by words or writing, or any other means whatever, to prevent such discharged employee, or any employee who may have voluntarily left said company's service, from obtaining employment with any other person, or company, said company shall be liable to such employee in such sum as will fully compensate him, to which may be added exemplary damages.

*Loparex, LLC v. MPI Release Techs., LLC*, 964 N.E.2d 806, 810 (Ind. 2012).[5]

[31] On appeal, both parties agree that the blacklisting statute provides relief to *discharged* employees who have been blacklisted from obtaining new employment by their former employer. The District contends that Rueth was not a "discharged employee" within the meaning of the blacklisting statute because his position as Gavit athletic director "was pursuant to a year-to-year

---

[5] Indiana Code section 22-5-3-1 of the blacklisting statute "addresses criminal penalties, provides qualified civil immunity for employers who disclose information about [current and] former employees unless that information was known to be false, and requires prospective employers to provide copies of the disclosures made by former employers. [Indiana Code section] 22-5-3-2 contains the civil cause of action at issue here." *Loparex, LLC*, 964 N.E.2d at 815.

contract, and [Rueth] completed the term in the spring of 2012." (Appellant's Br. p. 30). The District also notes that Rueth maintained his teaching position with the District even at the time of trial. In turn, Rueth insists that he was, in fact, a "discharged employee" because he "was formally released from his service as an athletic director at the District by . . . Principal Ondas." (Appellee's Br. p. 47).

[32] In considering whether Rueth was discharged as required by the blacklisting statute, we look to the dictionary to ascertain the plain meaning of the word. *See Koppin v. Strode*, 761 N.E.2d 455, 461 (Ind. Ct. App. 2002) (noting that, for statutory construction, "[w]hen the legislature has not defined a word, we give the word its common and ordinary meaning"), *trans. denied*. According to Black's Law Dictionary, "discharge" means, in relevant part, "[t]he firing of an employee." BLACK'S LAW DICTIONARY 495 (8th ed. 2004). Similarly, Meriam-Webster defines "discharge" as "to dismiss from employment" or "to release from service or duty." MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/discharge (last visited January 20, 2017).

[33] In this case, there is no dispute that Rueth's position as Gavit's athletic director was based on a one-year contract. In fact, the term of his final "Contract for Extracurricular Services" commenced on August 24, 2011, and ended on June 15, 2012. In previous years, under the authority of a former principal, Rueth was automatically re-hired at the expiration of his athletic director contract without having to go through the reapplication process. Following the 2011-2012 school year, however, Principal Ondas determined that she "want[ed] to

take [the athletic department] in a different direction." (Tr. Vol. I., p. 78).

Thus, at the expiration of Rueth's contract, Principal Ondas accepted applications from other candidates. Rueth was also invited to apply, which he did. A hiring committee was formed, which did not include Principal Ondas, and at the recommendation of the hiring committee, Principal Ondas hired a new athletic director. Based on the fact that Rueth had fulfilled the terms of his contract, we find that he was not discharged within the meaning of the blacklisting statute. Rueth was not fired from his teaching position at Gavit, nor was he prematurely released from his obligations under the athletic director contract. Rather, he served out the full term of the contract and, therefore, "had no expectation of continued employment after the expiration of each one-year contract." *Vincennes Univ. ex rel. Bd. of Tr. of Vincennes v. Sparks*, 988 N.E.2d 1160, 1168 (Ind. Ct. App. 2013), *trans. denied*. The fact that his contract was not renewed is not tantamount to a discharge. Thus, we find insufficient evidence to support a verdict for blacklisting.[6]

---

[6] The District also raises issues concerning the trial court's admission of hearsay into evidence, as well as the insufficiency of evidence supporting the $550,000 in damages awarded by the jury. Because we have concluded that there is insufficient evidence to support Rueth's claims of defamation and blacklisting, we need not address these other issues.

# CONCLUSION

[34] Based on the foregoing, we conclude that there is insufficient evidence to support a verdict for defamation or blacklisting, and, as such, the trial court abused its discretion by denying the District's Motion to Correct Error.

[35] Reversed.

[36] Crone, J. and Altice, J. concur