

**FILED**

Jun 27 2019, 6:23 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Anthony W. Patterson
Michael L. Schultz
Kent M. Frandsen
Parr Richey Frandsen Patterson
Kruse, LLP
Indianapolis, Indiana

James D. Moore
Kathryn J. Cook
Ryan, Moore, Cook, Triplett &
Albertson, LLP
Frankfort, Indiana

ATTORNEY FOR APPELLEE

Minh C. Wai
Kopka Pinkus Dolin, P.C.
Crown Point, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| The Estate of Charles D. Benefiel, by and through its Co-Personal Representatives, Michael D. Benefiel and Andrea D. Kessner, and The Estate of Linda D. Benefiel, by and through its Co-Personal Representatives, Michael D. Benefiel and Andrea D. Kessner, | June 27, 2019 |
| | Court of Appeals Case No. 18A-CT-2527 |
| | Appeal from the Clinton Circuit Court |
| *Appellants-Plaintiffs,* | The Honorable Bradley K. Mohler, Judge |
| v. | Trial Court Cause No. 12C01-1601-CT-55 |
| Wright Hardware Co., Inc., | |
| *Appellee-Defendant.* | |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellants-Plaintiffs, The Estate of Charles D. Benefiel, by and through its Co-Personal Representatives, Michael D. Benefiel and Andrea D. Kessner, and the Estate of Linda D. Benefiel, by and through its Co-Personal Representatives Michael D. Benefiel and Andrea D. Kessner (collectively, the Estate), appeal the verdict in favor of Appellee-Defendant, Wright Hardware Co., Inc. (Wright Hardware), in a negligence case arising out of a propane gas explosion wherein Charles and Linda Benefiel were killed.

We reverse and remand for a new trial.

# ISSUES

The Estate raises three issues on appeal, which we consolidate and restate as: Whether the trial court abused its discretion in permitting a defense expert witness to read *verbatim* into evidence an opinion set forth in an email to the defense expert witness.

# FACTS AND PROCEDURAL HISTORY

This appeal follows a defense verdict in a negligence case arising out of a propane gas explosion that killed Charles and Linda Benefiel in their rural Clinton County residence. The Benefiel home was built in 1983 and, at the time of the explosion, the residence used propane gas service for heat and to fuel other gas appliances in their home. Beginning in 2000, the Benefiels

became customers of Wright Hardware when Wright Hardware installed a 500-gallon liquid propane gas tank at the residence.

[5] On October 19, 2015, at 9:37 a.m., Wright Hardware employee Chuck Watkins received a call from the Benefiels, complaining they had no heat in the residence. William Taylor (Taylor) responded to the complaint and discovered the control board and gas valve were no longer functioning. He replaced both components. To complete the replacement, Taylor shut the gas off at the gas shut-off valve for the furnace, which terminated the gas service to the furnace only and left the gas on everywhere else in the house. He then disconnected the piping from the furnace. After reassembling the piping, Taylor used a manometer to test the flow pressure to the manifold to ensure the pressure was correct for the furnace. He tested the regulator on the new gas valve to check it was consistently producing the required pressure. In addition, he sniffed around the area and failed to detect any propane in the immediate vicinity. Finally, Taylor soap-tested the pipe fittings, but did not perform a leak test. Not finding any leaks, Taylor turned the gas on to cycle through the furnace a few times.

[6] On October 21, 2015, Wright Hardware delivered propane gas to the Benefiels' residence and filled the tank to eighty percent capacity. Two days later, on October 23, 2015, an explosion occurred which was followed by a fire, creating a debris field of 150 to 200 feet away from the residence. The home was substantially destroyed along with the surrounding buildings. It is not disputed by the parties that the explosion was caused by propane gas, which had been

sold by Wright Hardware to the Benefiels, and which had leaked inside the residence.

[7] Following the explosion, various experts investigated the incident in an effort to determine the occurrence of the leak and the causation of the explosion and fire. The explosion's magnitude made it impossible to ascertain the source of the leak, the ignition incident, or actual cause of the explosion. Nevertheless, the experts agreed that the explosion had been caused by propane gas of undetermined origin, and although the source of the leak could not be isolated, the leak had originated inside the house.

[8] Propane gas is flammable and dangerous; it is heavier than air and tends to pool in low places when it is released. Unlike other gases, it builds up over time if there is no air to move it and reaches an explosive level when it finds an ignition source. Several sets of standards and codes govern propane gas systems. The National Fire Protection Association (NFPA) 58 instituted a set of standards dealing with liquid petroleum gas installations which apply to piping outside the house. The International Fuel Gas Code (IFGC), published by the International Code Council, applies to propane or natural gas piping inside the house. Although Indiana has largely adopted the 2012 edition of the IFGC, the legislature has incorporated significant revisions and added provisions. *See* I.C. § 22-13-2-2; 675 Ind. Admin. Code 25-3-1 *et seq*. To reduce the risk of a propane explosion, the codes require that certain tests, including pressure tests and leak tests, be performed under certain circumstances. Together, the pressure tests and leak test confirm whether the entire system is

"gas tight," *i.e.*, not leaking. (Transcript Vol. III, p. 242). Section 4.6.6.3 of the IFGC, adopted in Indiana, provides that a leak test of the piping system shall be performed after a new installation or if there has been an "interruption of service." However, no statutory definition of what constitutes an interruption of service is included.

[9] On January 25, 2016, the Estate filed its Complaint for Damages sounding in negligence against Wright Hardware. On September 17, 2018, a five-day jury trial commenced. The Estate's theory of liability focused on Wright Hardware's failure to perform leak testing of the Benefiel home after Taylor replaced the control board and gas valve. According to the Estate, Taylor's work on the Benefiel's furnace by turning the gas shut-off valve constituted an interruption of service that required leak testing pursuant to the relevant provisions of the Indiana Fuel Gas Code (Ind. FGC). During the trial, several plaintiff and defense experts testified. The Estate's experts opined that Taylor needed to leak test the Benefiel gas system because shutting off the gas at the shut-off valve constituted an interruption of service. On the other hand, Wright Hardware's expert informed the jury that leak testing was not necessary because no interruption of service had occurred. In support of this opinion, Wright Hardware's expert, Todd Hetrick (Hetrick), had contacted the International Code Council (ICC), the drafters of the IFGC, and requested their interpretation of interruption of service, by posing an hypothetical fact pattern identical to this cause. More specifically, Hetrick questioned

> [w]here the Code uses the term '*interruption of service*,' does this refer only to an interruption in fuel gas supply to the *point of delivery* (*i.e.,* an outage of fuel gas supply from an onsite tank or utility to a customer's property), or does this term refer more broadly to also include a lack of fuel gas supply to a branch or isolated section of the piping system existing within a built structure, downstream of the *point of delivery*? Please provide guidance to define the term '*interruption of service*.'

(Appellant's App. Vol. II, p. 74).

[10] Gregg Gress (Gress), an employee of the ICC, responded to Hetrick's inquiry by email dated May 11, 2018. The Estate objected to Wright Hardware's questions regarding Hetrick's inquiry with the ICC and Gress' response. Over the Estate's objection, the trial court permitted Hetrick to read *verbatim* into evidence the first question and only the first sentence of Gress' response that defined interruption of service as "the utility has shut off the supply at the point of delivery, or an onsite fuel tank has been depleted." (Appellant's App. Vol. II, p. 77). In addition, Hetrick was permitted to read the second and third question, but was prohibited from reading any of Gress' responses. Hetrick was merely allowed to inform the jury that Gress' responses confirmed his own opinion. At the conclusion of the evidence, the jury rendered a verdict in favor of Wright Hardware, which was entered by the trial court on September 21, 2018.

[11] The Estate now appeals. Additional facts will be provided if necessary.

## DISCUSSION AND DECISION

[12] The Estate contends that the trial court abused its discretion by admitting certain testimony by Wight Hardware's expert. Focusing on Hetrick's reading of Gress' opinion of the meaning of interruption of service, the Estate maintains that this testimony constituted inadmissible hearsay, offered for its truth, and was prejudicial to the Estate's rights to a fair verdict.

[13] The standard of review for admissibility of evidence is abuse of discretion. *Weinberger v. Boyer*, 956 N.E.2d 1095, 1104 (Ind. Ct. App. 2011), *trans. denied*. The trial court abuses its discretion only when its action is clearly erroneous and against the logic and effect of the facts and circumstances before the court. *Id*. Even when the trial court erred in its ruling on the admissibility of evidence, this court will only reverse if the error is inconsistent with substantial justice. *Id*. To determine whether the admission of evidence affected a party's substantial rights, we assess the probable impact of the evidence upon the finder of fact. *In re Des. B.*, 2 N.E.3ds 828, 834 (Ind. Ct. App. 2014).

[14] At the heart of this appeal is the direct testimony by Wright Hardware's expert, Hetrick, regarding his investigation of the explosion. As part of his investigation, Hetrick reached out to the ICC in request for a staff opinion. In his email, Hetrick "asked [the ICC] [] what they meant by interruption of service." (Tr. Vol. V, p. 58). Gress, ICC's employee, responded to Hetrick's email. The response supported Wright Hardware's position that a leak test was not required under the circumstances presented here, and therefore no

negligence had been incurred. During direct testimony, counsel for Wright Hardware sought to question Hetrick as to each question he had queried to the ICC and the *verbatim* answer he received. The Estate objected, advising

> We object to the testimony that counsel has just sought to illicit. He's asked the witness to step through question and answer/question and answer to a letter that the witness sent to the [ICC]. We've been supplied with a copy of the letter. We have it. It is in his supplemental opinion. [] [A]nd then we have what they wrote back. What we don't have is the witness or the person who is rendering this opinion that they sent back to [Hetrick]. If you – it's as simple as looking at the website of the [ICC] and look through what they say about written staff opinions. And it gives you the procedure on how you do it and that's clearly what [Hetrick] has done here. And staff code – but, it says right below that "Staff code opinions issued by the ICC Technical staff do not represent the official position of the International Code counsel. The final authority of code opinions is the responsibility of the code official. Staff opinion is not intended to influence the code official." So you know, it's hearsay. He's asking for someone who works at the [ICC] to answer these questions and we're not able to cross examine that – that witness and so it's inappropriate; reliance material and inappropriate of the [c]ourt's statement that's being offered for the truth of the matter asserted therein.

(Tr. Vol. V, p. 60). Characterizing the interpretation of interruption of service as the "million dollar question everybody wants to know," the trial court noted that a "brief definition [] is really needed for the jury to make a decision" and ruled that

> That one sentence definition [of interruption of service] I'm going to allow to be read in. The other[] [questions], they get more

specific in facts applying to the case. I think those really more are for the jury to decide. I will allow those questions to be relayed and you can question as we discussed, but I'm not going to allow the verbatim answers to be read. But, I do want that interruption of service definition in.

(Tr. Vol. V, pp. 64, 74, & 75). The Estate now claims that Hetrick's expert testimony merely served as an improper vehicle to present the otherwise inadmissible hearsay evidence of Gress' definition in front of the jury.

[15] Hearsay, like Gress' definition before us, is an out-of-court statement offered to prove the truth of the matter asserted therein, which rests on the credibility of the out-of-court declarant who is unavailable for cross-examination. Ind. Evid. Rule 801(c). Hearsay is inadmissible unless the rules of evidence or other law provide otherwise. Evid. Rule 802. As such, inadmissible evidence may nevertheless be relied upon for the purposes of expert-rendered opinion testimony. As provided in Evidence Rule 703, "Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field."

> Earlier Indiana cases, and other courts governed by Rule 703, generally have found the following sorts of information to be reasonably relied upon by experts in various fields: hospital records, laboratory reports, X-rays, and doctors' medical records relied on by medical professionals; reports by subordinates relied upon by superiors; discussions with other experts in the expert's field; mental hospital records reports by clinical psychologists and social workers, and police reports relied upon by psychiatrists or forensic psychologists; a report from an engineering firm relied upon by an engineer; an autopsy report

relied upon by a pathologist; business records relied upon by an expert in the business field; and state agency records relied upon by a law enforcement officer.

Courts have shown considerable reluctance to find reasonable reliance on information not prepared by persons with specialized training, such as lay witness statements, anonymous reports, statements by a party, and data prepared in anticipation of litigation.

*Schmidt v. State*, 816 N.E.2d 925, 938-39 (Ind. Ct. App. 2004) (*quoting* 13 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE, INDIANA EVIDENCE § 703.107, 427-30 (footnotes omitted)).

[16] There are limits to this, however, to the extent that a party proffers opinion testimony that is merely "a conduit" for placing "physician's diagnoses into evidence without meaningful opportunities for cross-examination." *Faulkner v. Markkay of Indiana, Inc.*, 663 N.E.2d 798, 801 (Ind. Ct. App. 1996), *trans. denied*. As our supreme court has recognized,

Some experts customarily gather information from a variety of other experts and authoritative sources and rely upon it in reaching their opinions. When an expert witness's own independent opinion is arrived at in this manner and it is introduced into evidence and the expert witness is subject to cross-examination, that part of the substrata of information which aided in the formation of the opinion, though hearsay in nature and though not falling within any hearsay exception, may nevertheless be admissible for use by the trier of fact in judging the weight of the opinion.

*Barrix v. Jackson*, 973 N.E.2d 22, 26 (Ind. Ct. App. 2015) (*quoting Miller v. State*, 575 N.E.2d 272, 274 (Ind. 1991)), *trans. denied*. However, such hearsay is inadmissible where it is merely a restatement of another's conclusion "as a conclusory answer to an ultimate fact in issue," such that the veracity of the statement is not "subject to the test of cross-examination." *Id.* Accordingly, although an expert may rely on others' opinions as a basis for his opinion if other experts in the field reasonably rely on such opinions, the expert must bring his own expertise to bear in reaching his opinion and may not simply repeat opinions of others or announce that other experts concur with his opinion with respect to the case. *Duneland Props., LLC v. Northern Indiana Pub. Serv., Co.*, 14 N.E.3d 95, 105 (Ind. Ct. App. 2014).

[17] In support of its argument that it was impermissible for Gress' hearsay opinion to be admitted, the Estate refers this court to *Faulkner v. Markkay of Indiana, Inc.*, 663 N.E.2d 798 (Ind. Ct. App. 1996), *trans. denied*, a slip and fall case involving the testimony of a chiropractor as an expert witness. Faulkner requested to introduce into evidence a compilation of medical records generated by other health care providers through the chiropractor. *Id.* at 800. The trial court denied the admission of the evidence. *Id.* Finding that "a doctor of chiropractic does not have the same education, training or expertise as the physicians who prepared the reports," and noting that "a comparison of the licensing statutes shows that chiropractors are given only limited licenses, whereas physicians receive unlimited licenses as to the entire medical field," the

*Faulkner* court affirmed the trial court's exclusion of the medical reports. *Id*. at 801 (internal footnote omitted).

[18] We find *Faulkner* to be persuasive to the situation before us. Hetrick, a mechanical engineer, requested a "written staff code opinion" of the undefined term of interruption of service from the ICC. (Appellant's App. Vol. II, p. 72). Gress, a member of the "Senior Technical Staff" at the Central Regional Office of the ICC, responded by email, providing Hetrick with a definition of interruption of service, which was tendered *verbatim* to the jury. (Appellant's App. Vol. II, p. 77). However, this opinion is "advisory" only, and was not approved by the legal staff at the ICC. (Appellant's App. Vol. II, p. 77). Furthermore, whereas Indiana's Legislature adopted the IFGC with significant changes, most notably in what constitutes 'piping' pursuant to the Code, Gress' opinion is solely "based on ICC-published codes and do[es] not include local, state or federal codes, policies or amendments." (Appellant's App. Vol. II, p. 77). Ultimately, Gress cautioned that "the final decision is the responsibility of the designated authority charged with the administration." (Appellant's App. Vol. II, p. 77).

[19] Hetrick explained to the jury that because the IFGC did not define the term, he reached out to the ICC "in request for a staff opinion." (Tr. Vol. V, p. 58). Hetrick affirmed that he received a reply and read to the jury *verbatim* the definition of interruption of service provided by Gress. Although it is clear that Gress is not a member of ICC's legal department, no evidence of Gress' educational background, qualifications, or expertise was introduced, besides the

fact that he is an employee of the ICC. Rather, it appears that Gress represented his own non-binding interpretation of a legal term within the context of the ICC only, and did not interpret the term within the context and revisions of the Indiana Code. The reliability of the interpretation, as well as the expertise of Gress, could not be challenged through cross-examination. Accordingly, without being informed of Gress' qualifications or Gress himself being available for cross-examination, we cannot say that Gress' opinion could be reasonably relied upon by Hetrick.

[20] Moreover the admission of the *verbatim* definition was prejudicial to the Estate and constituted reversible error. Termed "the million dollar question," and battled over by experts on both sides, the jury was handed a definition of 'interruption of service' which was represented to be issued by the entity that also wrote the Code and purported to provide a definitive answer on an ultimate issue. (Tr. Vol. V, p. 64). During closing argument, counsel for Wright Hardware explained to the jury that because there was a disagreement on the definition, Hetrick contacted the ICC to "please help us to find what interruption of service is[.]" (Tr. Vol. V, p. 168). As such the jury was given the impression that this definition, interpreting the IFGC, was cloaked with authority to equally define the term in the Indiana Code. It was only after Gress' opinion was read *verbatim* that Hetrick affirmed that his own opinion aligned with the definition provided by Gress. Viewed in the totality of the trial proceedings, Hetrick's testimony in essence amounted to nothing more than a

mere conduit to get otherwise inadmissible hearsay evidence in front of the jury.

# CONCLUSION

[21] Based on the foregoing, we hold that the trial court's admission of a *verbatim* hearsay opinion which was read into evidence by the defense expert witness was prejudicial to the Estate and amounted to reversible error.

[22] Reversed and remanded for a new trial.

[23] Bailey, J. and Pyle, J. concur