## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 20 2020, 8:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Neal F. Eggeson, Jr.
Eggeson Privacy Law
Fishers, Indiana

ATTORNEYS FOR APPELLEE

Christopher L. Riegler
Kimberly E. Schroder
Patricia B. Freije
Katz Korin Cunningham PC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

John Stuck and Cathy Stuck,
*Individually and as Parents of D.S., a minor,*

*Appellants-Plaintiffs,*

v.

Franciscan Alliance, Inc. d/b/a Franciscan St. Francis Health Mooresville,

*Appellee-Defendant,*

May 20, 2020

Court of Appeals Case No.
19A-CT-1407

Appeal from the Morgan Superior Court

The Honorable Sara A. Dungan, Judge

Trial Court Cause No.
55D03-1611-CT-1747

**Robb, Judge.**

# Case Summary and Issues

[1] John and Cathy Stuck sued Franciscan Alliance, Inc. ("Franciscan"), doing business as Franciscan St. Francis Health Mooresville ("St. Francis"), alleging a Franciscan employee had publicly posted protected health information about John's son, D.S. Specifically, they alleged that they learned of D.S.'s death through a comment the Franciscan employee had made on a social media post about an accident D.S. had been involved in and that they suffered damages as a result thereof. They sued Franciscan under a theory of respondeat superior liability (among others). A jury found in favor of Franciscan. The Stucks appeal the judgment, raising three issues for our review which we reorder and restate as: 1) whether the trial court erred in admitting certain evidence over the Stucks' objection; 2) whether the trial court erred in instructing the jury about respondeat superior liability; and 3) whether the trial court erred in denying the Stucks' motion for judgment on the evidence following the verdict. Concluding the trial court did not err in its admission of evidence, in instructing the jury, or in refusing to disturb the jury's verdict, we affirm.

# Facts and Procedural History[1]

---

[1] Franciscan has filed a Motion to Strike two passages from Appellants' Brief. By separate order, we grant that motion and have not considered the content of those statements.

[2] John and Cathy were married in July of 2015, after dating for approximately a year and a half.[2] John had two children, including sixteen-year-old D.S., and Cathy had two children, including twelve-year-old P.J., when they married. On the evening of August 13, 2015, D.S. and P.J. were riding the family ATV around their neighborhood in Mooresville when they had an accident. Both children were injured, and two ambulance crews responded.

[3] One ambulance took P.J. and Cathy to Riley Hospital in Indianapolis. The second ambulance crew took D.S. to St. Francis to rendezvous with Lifeline. John drove himself to St. Francis to try to meet the ambulance there. By the time he arrived, however, D.S. had already come and gone; the ambulance arrived at St. Francis at 7:25 p.m., D.S. was taken to the emergency department to be intubated, and he was airlifted to St. Vincent Hospital around 8:00 p.m. Staff at St. Francis told John that D.S. was either on his way to Methodist Hospital or Riley Hospital, but "most likely Riley, since he was still underage[.]" [Transcript of] Jury Trial, Volume 3 at 3. On the way to Riley, John called his parents to tell them about the accident. John's brother and sister-in-law, Chris and Tiffanie, were at John's parents' house at the time. The extended family also headed to Riley on hearing the news.

[4] Also on August 13, 2015, Linda Turk had worked in environmental services at St. Francis for a few months. Her job involved cleaning and sterilizing patient

---

[2] John and Cathy divorced in 2018, after this lawsuit was filed.

rooms and cleaning bathrooms and hallways. Part of her orientation to the job involved training regarding patient privacy laws and expectations. Turk understood that protecting patient privacy was expected of every Franciscan employee. *See* Tr., Vol. 2 at 174-75. The evening of D.S.'s accident, Turk was working an evening shift, due to leave around midnight. Turk was cleaning a room at what she thought was "maybe 4:30, 5 o'clock" when an ICU nurse entered and said the Lifeline helicopter had just landed, "come here and look." *Id.* at 143, 152; *see also id.* at 195 (Turk testifying that it "was between 4 and 4:20 when the nurses came and grabbed us out of . . . the ICU room, to go see that Lifeline had landed"). Turk followed the nurse to a room where they could see the helicopter. Another ICU nurse joined them, and the two nurses talked "about how the patient was on [an] ATV, how it had flipped with him and his brother on it, and that he was pretty badly beaten up from the accident." *Id.* at 150. As they all left the room, they encountered an emergency department nurse who told them that the patient's "injuries were really bad. They had gotten him stable there, and they were getting ready to put him back on Lifeline to transport him to another trauma one hospital." *Id.* Turk's understanding of the patient's condition was that "he was not going to probably survive [the] accident." *Id.* at 199. Turk returned to her duties.

[5] The timing of what took place next was the subject of much discussion throughout these proceedings, as it was important to both the Stucks' case and to Franciscan's defense. At some point, Turk perused Facebook on her phone and saw a story posted on WRTV's page about an ATV accident. Putting two

and two together, Turk commented on the post, writing, "Life lined landed at work with one of them and he was lookin very bad. I hope this shows not only their family but other families that ATVs r very much so dangerous. I'm sorry for the family's lose." List of Exhibits, Volume 1 at 246 (spelling and abbreviations in original).[3] Turk said she expressed sympathy for the family's loss because the WRTV story indicated the victim of the accident had died. In the immediate aftermath of these events, while Turk's conduct was being investigated by Franciscan, Turk's supervisor recorded that Turk told him she had commented on the post while sitting in her car after her shift, around 11:45-11:55 p.m. *See* Ex., Vol. 2 at 37. At her deposition, Turk said she did not know the exact time she posted her comment but guessed it was probably around 8 p.m. or 8:30 p.m. Franciscan asked, "[H]ow we've been operating was that it was much later. Could that be possible? . . . Say, around 11:00 or 11:30?" Appellants' Appendix, Volume II at 84. In response to that prompt, Turk conceded it was possible. *See id.* At trial, however, she testified that she posted the comment on her dinner break around 8:00 p.m. and consistently disavowed making the post after 11:00 p.m. or having told her supervisor she made the comment at that time. Turk also testified at trial that when she took her last break of the evening, around 10:30 p.m., she found "rude and hateful comments towards me" and comments from the family and decided to delete her original comment. Tr., Vol. 2 at 155.

---

[3] Citations to the exhibits are to the public access version and based on the .pdf pagination.

[6] Meanwhile, John arrived at Riley, located Cathy, and they tried to locate D.S. One of the Riley nurses eventually told them that D.S. was at St. Vincent Hospital. John and his father left Riley to go to St. Vincent. "About 8, 8:30, no later than 9[,]" Tiffanie looked at Facebook and saw WRTV's post about the accident. *Id.* at 211. Scrolling through the comments on the post, Tiffanie saw Turk's comment and concluded D.S. "didn't make it." *Id.* Chris called John and asked if D.S. had passed because "people were posting on Facebook, or doing different posts, that alluded to the fact that D.S. had passed." Tr., Vol. 3 at 5. John was not yet at St. Vincent when Chris called, but when he arrived around 8:50 p.m., he was met at the door by a doctor and a sheriff who took John into a private room and told him D.S. had died. In explaining the difference between hearing the news from the doctor and hearing about a Facebook post from his brother, John said,

> The physician had tact, and caring and compassion. . . . He was emphathetic [sic], I mean, he was sympathetic to what he was telling me. Facebook, I truly believe, is partly the devil. And it's . . . it's ridiculous the amount of things that are posted and hurtful things. [It] wasn't one hundred percent known, it wasn't, but tell that to a father that's on his way to help his son, that oh it's just Facebook, it might not be true.

*Id.* at 7. Medical records showed D.S. had gone into cardiac arrest while en route to St. Vincent, and CPR was initiated approximately ten minutes prior to landing. CPR was continued and other life-saving measures were attempted upon his arrival at St. Vincent but after approximately thirty minutes, doctors pronounced D.S. deceased at 8:45 p.m.

[7]  In the early morning hours of August 14, Kathy Cooper, St. Francis Nursing Supervisor, sent an email to several Franciscan employees and/or executives advising them that at 12:45 a.m., she had received a call from Kathy Coss "about a person by the name of Linda Turk posting some comments about ATV accident on facebook." Ex., Vol. 2 at 35. Coss was affiliated with another local hospital and was concerned the post might be a privacy violation. Coss said the post had been removed by the time she called but that she had taken a screenshot of it. Cooper's email also advised that several minutes after Coss' call, a nurse in the St. Francis emergency department called her and said another Franciscan employee had seen Turk's comment before it was deleted and had called in to report it. She also had taken a screenshot of the comment. Cooper's email was forwarded to Rebecca Merkel, Franciscan's privacy officer. Merkel initiated an investigation which included getting the screenshots of Turk's comment from the two people who had reported the comment. Turk was placed on suspension while Franciscan investigated. At the end of her suspension, Turk's employment with Franciscan was terminated.

[8]  The Stucks filed an amended complaint against Franciscan in February 2017 alleging that Franciscan was vicariously liable for negligent acts of its employee that caused "emotional harm and an irreparable loss of privacy[.]" Appellants' App., Vol. II at 25. The case was tried to a jury which returned a verdict for Franciscan. The Stucks filed a motion to correct error, which was denied, and then initiated this appeal of the judgment.

# Discussion and Decision

## I. Admission of Evidence

### A. Standard of Review

We review a trial court's decision regarding admission of evidence for an abuse of discretion. *Estate of Benefiel v. Wright Hardware Co., Inc.*, 128 N.E.3d 485, 489 (Ind. Ct. App. 2019), *trans. denied*. The trial court abuses its discretion only when its action is clearly erroneous and against the logic and effect of the facts and circumstances before the court. *Id.* Even when the trial court errs in its ruling on the admissibility of evidence, however, we will only reverse if the error is inconsistent with substantial justice. *Id.* To determine whether the erroneous admission of evidence affected a party's substantial rights, we assess the probable impact of the evidence upon the finder of fact. *Id.*

### B. Admission of Social Media Posts

Before the presentation of evidence began, the trial court heard argument from the parties on the admissibility of Plaintiff's Exhibit 4:

**Linda Turk**
Life lined landed at work with one of them and he was lookin very bad. I hope this shows not only their family but other families that ATVs r very much so dangerous. I'm sorry for the family's lose.

Ex., Vol. 1 at 246.[4]  Franciscan objected to the proposed exhibit because it had

been excised from a larger context, contained in Franciscan's Exhibit R:



Ex., Vol. 2 at 30.[5]  Franciscan argued, with respect to Exhibit 4:

> [T]he statement is clearly a hearsay statement, in that there's no
> information provided here, and we don't, I guess, have the
> custodian here.  This was a post that they claim was captured
> from social media.  We don't have any kind of authentication

---

[4] Exhibit 4 also includes a thumbnail picture of Turk to the left of her name.

[5] This image from Exhibit R is one of the screenshots Franciscan obtained as part of its investigation.

about where this document came from.  But, more importantly, Your Honor, under [Evidence Rule] 106, the completeness doctrine requires that if a portion of a writing is going to be admitted into evidence, that the remainder of that writing be admitted as well[.]  Your Honor, that clip, as you can see, based on what we have, is taken out of context in that what you've got there on Plaintiff's proposed exhibit 4 is just the alleged comment to have been made, but it's taken out of a writing that you can see is amongst a variety of other comments, and most importantly you can see that it was made on a news post.

Tr., Vol. 2 at 103.  The Stucks responded that the post, as presented in Exhibit 4, was not hearsay because it was not being introduced for the truth of the matter asserted.  Further, Turk was going to testify and lay the foundation for its admission.  Counsel averred that he had "excised all of the objectionable material" – "the timestamp, all of the other comments, all of the WISH TV logo" – such that "[a]ll that's left is admissible." *Id.* at 104.[6]  The trial court stated it was going to allow Exhibit 4 over objection, and when pressed by Franciscan about the admission of Exhibit R, stated, "I think [Exhibit R] would be relevant[.  F]or right now I would see R as potentially coming in as well for [Franciscan] to use to cross examine Ms. Turk on." *Id.* at 107.

[11]  During the Stucks' direct examination of Turk, Turk testified that Plaintiff's Exhibit 4 "is my post that I put . . . on RTV 6's comment page." *Id.* at 153.

---

[6] Turk consistently said she commented on WRTV's Facebook page. Tiffanie Stuck testified she saw the comment on WRTV's page.  That it appears in Exhibit R over a WISH-TV background was never explored or explained.

Exhibit 4 was admitted over Franciscan's renewed objection. And during Franciscan's cross-examination of Turk, Defendant's Exhibit R was admitted over the Stucks' objection. Turk identified Exhibit R, showing comments before and after hers, as what the post "actually looked like" when she commented on it. *Id.* at 178-79. The Stucks objected on the basis of authentication and hearsay issues with both other's people's comments and the time stamp.[7] In overruling the objection, the trial court stated, "The parties can explain Facebook posts, timing of things and stuff through other questions." *Id.* at 180. The Stucks argue the trial court abused its discretion in admitting Exhibit R because it "allowed Franciscan to create the false impression that the social media post was created several hours later than was testified to by Linda Turk." Appellants' Brief at 16.

[12] Franciscan defended the admission of Exhibit R by pointing to Indiana Evidence Rule 106 and the doctrine of completeness. Evidence Rule 106 provides, "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part – or any other writing or recorded statement – that in fairness ought to be considered at the same time." The rule incorporates the common law doctrine of

---

[7] In addition to the image shown above, Exhibit R consists of three photos of a phone taken at 1:13 a.m. displaying various comments on what appears to be Facebook, including comments from Kathy Coss and Tiffanie Stuck, and a screen shot taken at 12:52 a.m. of what appears to be comments to a Fox59 news story, including a comment from Tiffanie Stuck directed to Kathy Coss thanking her for taking a screenshot of Turk's earlier comment. Ex., Vol. 2. at 30-33. None of these screenshots include Turk's comment. Although the Stucks now contend those additional images were admitted in error, it does not appear they were specifically challenged at trial, nor was Turk asked about them.

completeness, the purpose of which is "to allow the introduction of additional material to place incomplete, misleading evidence in its full context." *In re Paternity of B.B.*, 1 N.E.3d 151, 159 (Ind. Ct. App. 2013). We do not disagree that Exhibit 4 was but a part of a larger "writing" (in the form of a comment thread) and that Exhibit R placed the comment in context. Under Rule 106, however, the redacted portions of a document are still subject to normal rules of admissibility before they may be admitted. *Walker v. Cuppett*, 808 N.E.2d 85, 97 (Ind. Ct. App. 2004).

[13] The Stucks objected to the admission of Exhibit R on the basis of hearsay and lack of authentication. As for the hearsay objection, just as with the Stucks' Exhibit 4, Exhibit R was not admitted to prove the truth of the matter asserted. The actual substance of the other comments shown in Exhibit R is largely irrelevant and the truthfulness of Turk's comment is not at issue – the issue is that she posted a comment at all. Exhibit R was simply offered to show the context in which Turk's earlier-admitted comment appeared.

[14] To lay a foundation for the admission of evidence, the party offering the evidence must show that it has been authenticated. *Hape v. State*, 903 N.E.2d 977, 989 (Ind. Ct. App. 2009), *trans. denied*. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Ind. Evidence Rule 901(a). Absolute proof of authenticity is not required; an item is admissible if the evidence establishes a reasonable probability that the item is what it is claimed to be. *In re Paternity of B.B.*, 1

N.E.3d at 156. If this reasonable probability is shown, "any inconclusiveness of the exhibit's connection with the events at issue" goes to the weight to be given to the evidence. *Fry v. State*, 885 N.E.2d 742, 748 (Ind. Ct. App. 2008), *trans. denied*. Sufficient evidence to prove authenticity includes the testimony of a witness with knowledge. Evid. R. 901(b)(1). The Stucks cite to several cases which they contend "outline the parameters for authenticating social media evidence." Appellants' Br. at 31. But we are not here concerned with authenticating a Facebook account, *see Richardson v. State*, 79 N.E.3d 958 (Ind. Ct. App. 2017), *trans. denied*, or verifying the identity of the author of a tweet, *see Wilson v. State*, 30 N.E.3d 1264 (Ind. Ct. App. 2015), *trans. denied*. Exhibit R was not offered for either of those evidentiary purposes. It was offered only to show that Turk's comment was one among several comments posted on a public Facebook page. Turk herself authenticated her comment as made by her (as she did with the Stucks' Exhibit 4) and authenticated the exhibit as showing what the Facebook page looked like when she commented, thereby establishing Exhibit R was what it claimed to be – a visual representation of a social media thread.

[15] Finally, as to the timestamp, Franciscan did ask Turk whether there was a "timeline on top of" the image in Exhibit R and whether it said "12:15." Tr., Vol. 2 at 200. Turk agreed that there was a time displayed and it said 12:15. The Stucks then clarified with Turk that one, there was no time stamp or other time identifying information on her actual comment and two, "looking at this, we really can't tell what time your post was made, just because there's a

timestamp of 12:15 at the top." *Id.* at 202. The trial court noted, when admitting Exhibit R, that the parties could "explain Facebook posts, timing of things and stuff through other questions." *Id.* at 180. That is precisely what the Stucks did, and in the process, the timestamp was unmoored from the comment. Moreover, there can be no question that the timestamp on the image does not relate directly to the timing of Turk's comment, because even though the parties disagree about when she made the comment, the timeline is somewhere between 8:00 p.m. and 11:45 p.m. Conflicts and discrepancies in the evidence are for the jury to resolve. *Naumoski v. Bernacet*, 799 N.E.2d 58, 61 (Ind. Ct. App. 2003), *trans. denied*. Further, the improper admission of evidence is harmless error if the evidence is cumulative of other evidence admitted. *Donaldson v. Indianapolis Pub. Transp. Corp.*, 632 N.E.2d 1167, 1172 (Ind. Ct. App. 1994). Given that there was independent evidence that Turk made her comment after her shift, any error in admitting Exhibit R without redaction of the timestamp was harmless error.

## II. Jury Instructions

### A. Standard of Review

Instructions serve to inform the jury of the law applicable to the facts presented at trial, enabling it to comprehend the case sufficiently to arrive at a just and correct verdict. *Carter v. Robinson*, 977 N.E.2d 448, 457 (Ind. Ct. App. 2012), *trans. denied*. When we review a trial court's decision to give or refuse a tendered instruction, we consider whether: 1) the instruction correctly states the law; 2) the evidence in the record supports giving the instruction, and 3) the

substance of the instruction is covered by other instructions. *Humphrey v. Tuck*, 132 N.E.3d 512, 515 (Ind. Ct. App. 2019) (quotation omitted). The trial court has sole discretion in instructing the jury, and when an instruction is challenged under the last two prongs, we will defer to the trial court and reverse only for an abuse of discretion. *Wal-Mart Stores, Inc. v. Wright*, 774 N.E.2d 891, 893 (Ind. 2002). When an instruction is challenged as an incorrect statement of the law, however, we apply a de novo standard of review. *Id.* at 893-94.

[17] A party seeking a new trial on the basis of an improper jury instruction must show a reasonable probability that its substantial rights have been adversely affected. *Golden Corral Corp. v. Lenart*, 127 N.E.3d 1205, 1217 (Ind. Ct. App. 2019), *trans. denied*. In other words, "[a]n erroneous instruction merits reversal if it could have formed the basis for the jury's verdict." *Fleetwood Enter., Inc. v. Progressive N. Ins. Co.*, 749 N.E.2d 492, 495 (Ind. 2001).

## B. Respondeat Superior Instruction

[18] The Stucks' complaint is grounded in respondeat superior – that Franciscan is responsible for Turk's conduct in posting protected health information on social media and that such posting caused them injury. Under the doctrine of respondeat superior, an employer is liable for an employee's tortious acts only if those acts occurred within the scope of employment. *Cox v. Evansville Police Dep't*, 107 N.E.3d 453, 460 (Ind. 2018). For an employee's act to fall "within the scope of employment," the act must be incidental to authorized conduct or further the employer's business to an appreciable extent. *Knighten v. E. Chicago*

*Housing Auth.*, 45 N.E.3d 788, 792 (Ind. 2015). An employee's act is not within the scope of employment when it occurs during an independent course of conduct not intended to serve any purpose of the employer. *Id.* An employer is not held liable under the doctrine of respondeat superior because it did anything wrong, but rather "because of the [employer's] relationship to the wrongdoer." *Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142, 147 (Ind. 1999).

[19] Both sides tendered instructions regarding respondeat superior. The trial court rejected both submissions in favor of the model instruction, designated Final Instruction Number 11:

> An employer is liable for the [negligent][wrongful] act of its employee done within the scope of [his][her] employment, if the act is a responsible cause of injury to the plaintiff.
>
> An employee's [negligent][wrongful] act is within the scope of employment when the employee's [negligent][wrongful] act occurred while the employee was performing activities expressly or impliedly authorized by the employer, or activities incidental to the employee's authorized activities.

Appellant's App., Vol. II at 209; *see also* Tr., Vol. 4 at 78.[8]

[20] The Stucks contend Final Instruction Number 11 is an incomplete statement of the law because it does not explain what it means for an act to be "incidental"

---

[8] The 2019 edition of the model instruction is slightly different, but both parties agree that the instruction the trial court gave was the then-current model instruction on respondeat superior.

to employment and offers no guidance for how to assess evidence that the employee violated the employer's rules or policies.[9] Because their tendered instructions addressed both of these issues, the Stucks contend the trial court erred in giving Final Instruction Number 11 without also giving their proffered instructions. *Cf. FMC Corp. v. Brown*, 526 N.E.2d 719, 731 (Ind. Ct. App. 1988), *aff'd*, 551 N.E.2d 444 (Ind. 1990) ("A party may not complain an instruction is incomplete, when such party does not tender a more complete instruction.").

[21] The Stucks' tendered instructions on respondeat superior read as follows:

> An act is within the scope of employment if it is incidental to the employee's job duties, that is to say, the employee's wrongful act originated in activities closely associated with her job. In deciding whether an employee's wrongful act was incidental to her job duties or originated in activities closely associated with her job, you may consider:
> 1. whether the wrongful act was of the same general nature as her authorized job duties;
> 2. whether the wrongful act is intermingled with authorized job duties; and
> 3. whether the employment provided the opportunity or the means by which to commit the wrongful act.

---

[9] The Stucks also argue the instruction is an incorrect statement of the law, but as their conclusion is that the instruction was "in desperate need of clarification" ostensibly provided by their proposed instructions, we will address the issue as whether the instruction is incomplete, rather than incorrect. Appellants' Br. at 20.

Moreover, we note that although the Indiana Supreme Court has not formally approved Indiana Pattern Jury Instructions for use, it has recognized their existence and given them "some preferential status." *Schultz v. Ford Motor Co.*, 857 N.E.2d 977, 980 n.2 (Ind. 2006).

Appellants' App., Vol. II at 145 (Plaintiffs' Proposed Final Instruction No. 4).

> The fact that an employee violated the employer's rules, orders, or instructions, or engages in expressly forbidden actions, does not remove the employee's wrongful acts from the scope of employment.

*Id.* at 146 (Plaintiffs' Proposed Final Instruction No. 5).

### 1. *Proposed Instruction 4*

Proposed Instruction 4 was an instruction offered by the plaintiff and given in *Walgreen Co. v. Hinchy*, 21 N.E.3d 99, 110-11 (Ind. Ct. App. 2014), *trans. denied*. The instruction was challenged on appeal as an incomplete explanation of the term "incidental." *Id.* at 111. The court held that giving the challenged jury instruction was not clearly erroneous because one, Walgreen had not tendered a more complete instruction and two, the tendered instruction was a correct statement of the law on the facts presented. *Id.* In other words, the instruction was supported by the evidence in that case. Here, we cannot say the same.

In determining whether sufficient evidence exists to support an instruction, we will look only to the evidence most favorable to the appellee and any reasonable inferences to be drawn therefrom. *Humphrey*, 132 N.E.3d at 515. In *Hinchy*, the employee was a pharmacist whose authorized duties included using Walgreen computer equipment to handle prescriptions for Walgreen customers, look up customer information, review customer prescription histories, and make prescription-related printouts. 21 N.E.3d at 108. The case arose when the employee did those things for a personal reason and revealed the information

she obtained to a third party. Thus, whether some of her actions were authorized, or incidental to authorized actions, or of the same general nature as authorized actions was part of the ultimate question for the jury to decide. *Id.* at 111 (explaining that "to the extent that Walgreen argues that the mere facts that [the employee] was on duty and using Walgreen equipment is insufficient to establish respondeat superior, [plaintiff] agrees. But we agree with [plaintiff] that these facts are relevant and that a reasonable jury may consider them").

[24] Here, the alleged wrongful act – gathering and disseminating confidential patient information – was unequivocally not of the same general nature as Turk's authorized job duties. She worked in environmental services, cleaning, dusting, and removing trash from patient rooms and hallways. She did not have a need to know any patient information for a purpose related to her job. Although Turk gained the information she revealed while working, her *disclosure* of that information was not intermingled with her job duties, which, again, were janitorial in nature. Finally, notwithstanding the decision of the court in *Hinchy* regarding this instruction as a whole, part 3 that would instruct the jury that it could consider "whether the employment provided the opportunity or the means by which to commit the wrongful act" is an overstatement, at least with respect to these facts. Appellants' App., Vol. II at 145. "[S]imply because an act could not have occurred without access to the employer's facilities does not bring it within the scope of employment." *Robbins v. Trustees of Indiana Univ.*, 45 N.E.3d 1, 8 (Ind. Ct. App. 2015). The only part of Plaintiff's Proposed Instruction 4 that is a correct statement of the law *and*

supported by evidence in the record is the first sentence, and the substance of that sentence is covered by the trial court's instruction. The trial court did not abuse its discretion in refusing to give Plaintiff's Proposed Instruction 4.

## 2. *Proposed Instruction 5*

Proposed Instruction 5 is based on language from *Cox v. Evansville Police Dep't.*, 107 N.E.3d at 461: "[T]he scope of employment . . . may include acts that the employer expressly forbids[ or] that violate the employer's rules, orders, or instructions[.]" As with Proposed Instruction 4, we conclude the evidence does not support giving this instruction. In *Cox*, the employee was an on-duty police officer who sexually assaulted a woman he was dispatched to investigate. The woman sued the city that employed the officer for vicarious liability under the doctrine of respondeat superior, among other theories of liability. Relevant to this case, the court was asked to decide whether the city was entitled to summary judgment on the respondeat superior claim. The court's decision that summary judgment was not appropriate was grounded in the "unique nature of police employment": "that police officers' duties come with broad authority and intimidating power that may affect vicarious liability. More specifically, because police officers' employer-conferred power is so great, the range of acts for which a city may be vicariously liable stretches far." *Id.* at 459-60. Those facts are clearly far afield from the facts here, in that of course committing a crime was expressly forbidden by the city police department's rules, but it was also the very nature of the police officer's work and position that allowed him to commit the crime. The position Turk's employment with Franciscan put her

in is not at all similar. There was testimony that disclosing patient information was against Franciscan's rules, but the difference between this case and *Cox* is that the nature of Turk's position in environmental services did not authorize her or generally put her in a position to know patient information. And we note that the language used for Proposed Instruction 5 did not come from a discussion of jury instructions. In fact, given the procedural posture of *Cox*, jury instructions were not yet a consideration. "The mere fact that language appears in appellate opinions does not necessarily make it proper for jury instructions." *Dunlop v. State*, 724 N.E.2d 592, 595 (Ind. 2000). Additionally, an instruction that singles out or unduly emphasizes a particular fact or evidence is erroneous. *Keller v. State*, 47 N.E.3d 1205, 1208 (Ind. 2016). Accordingly, the trial court did not abuse its discretion in refusing to give Plaintiff's Proposed Instruction 5.

# III. Motion for Judgment on the Evidence

## A. Standard of Review

In their motion to correct error, the Stucks made a motion for judgment on the evidence as to Franciscan's liability. "Indiana's trial rules allow a party to move for judgment on the evidence in a motion to correct error." *Sch. City of Hammond Dist. v. Rueth*, 71 N.E.3d 33, 40 (Ind. Ct. App. 2017) (citing Ind. Trial Rule 50(A)(4)), *trans. denied*. "When considering a motion to correct error, if the court 'determines that prejudicial or harmful error has been committed,' it 'shall take such action as will cure the error.'" *Id.* at 41 (quoting T.R. 59(J)). Trial Rule 50(A) provides,

> Where all or some of the issues in a case tried before a jury or an
> advisory jury are not supported by sufficient evidence or a verdict
> thereon is clearly erroneous as contrary to the evidence because
> the evidence is insufficient to support it, the court shall withdraw
> such issues from the jury and enter judgment thereon or shall
> enter judgment thereon notwithstanding a verdict.

[27] When a trial court considers a motion for judgment on the evidence following a jury verdict, the court "may not weigh the evidence and must view only the evidence favorable to the non-moving party and the reasonable inferences to be drawn from that evidence." *Rueth*, 71 N.E.3d at 41 (quotation and citation omitted). A motion for judgment on the evidence should be granted "only where there is a complete failure of proof because there is no substantial evidence or reasonable inference supporting an essential element of the claim." *Drendall Law Office, P.C. v. Mundia*, 136 N.E.3d 293, 304 (Ind. Ct. App. 2019), *trans. denied*. "If there is relevant evidence that supports the verdict, a motion for judgment on the evidence is improper because the final determination must be left to the fact-finder." *Rueth*, 71 N.E.2d at 41. When, as in this case, the trial court denies the motion, "it is not the province of this Court to do so unless the verdict is wholly unwarranted under the law and the evidence." *Ohio Farmers Ins. Co. v. Ind. Drywall & Acoustics, Inc.*, 970 N.E.2d 674, 685 (Ind. Ct. App. 2012), *trans. denied*.

## B.  Nonparty Defense

[28] The Stucks named only Franciscan as a defendant in its complaint for damages arising out of Turk's conduct. In seeking judgment on the evidence, the Stucks

contended that because Franciscan admitted in its answer to the Stucks' complaint that "its employee made a post on Facebook as alleged in paragraph 5 of [the Stucks'] Amended Complaint" and did not identify that employee as a nonparty, they are entitled to judgment as a matter of law that Franciscan is vicariously liable for any harm caused by the Facebook post. Appellants' App., Vol. II at 226 (quoting Franciscan's Answer, *id*. at 30). The trial court denied the Stucks' motion to correct error and by extension, their motion for judgment on the evidence.

[29] Essentially, the Stucks argue that Franciscan did not properly preserve a nonparty defense and therefore cannot place blame on Turk:

> As a practical matter, this means that the jury should not have been permitted to separate Linda Turk's misconduct . . . from Franciscan's own liability. In other words, the conclusion that Linda Turk . . . acted tortiously automatically mandated that *Franciscan MUST be vicariously liable.*

Appellants' Br. at 25 (emphasis in original).[10] In doing so, the Stucks use concepts arising under the Comparative Fault Act (the "Act"). *See* Ind. Code ch. 34-51-2. The Act allows a defendant to assert a "nonparty defense" and seek to allocate some or all of the fault for a claimant's damages to a nonparty rather than the named defendant. Ind. Code § 34-51-2-14.

---

[10] This argument assumes that the jury concluded Turk acted tortiously. As the jury returned a general verdict, there is no way to know what conclusions the jury made.

[30] In a respondeat superior situation, however, because Turk is the employee upon whose conduct the Stucks' claim is premised, she is not a "nonparty" in the usual sense. Under the doctrine of respondeat superior, liability is imposed on an employer who is without fault; his liability arises by operation of law where his employee has committed a wrongful act *while in his service*. *Stropes by Taylor v. Heritage House Childrens Ctr. of Shelbyville, Inc.*, 547 N.E.2d 244, 247 (Ind. 1989). The employer and employee are jointly and severally liable: both the employer and employee are liable for any injury and damages caused by the employee's negligence, and either or both may be sued for such damages at the option of the injured party. *Henry B. Steeg & Assocs., Inc. v. Rynearson*, 143 Ind. App. 567, 570, 241 N.E.2d 888, 889 (1968); *see also Gomez v. Adams*, 462 N.E.2d 212, 225 (Ind. Ct. App. 1984) (in evaluating a challenged jury instruction telling the jury not to allocate damages between an employer and employee both named as defendants but return judgment in a single sum, noting that where the employer's liability is based solely on respondeat superior, their liability is joint and several and the instruction would be proper).

[31] The Stucks admitted in the trial court that this is not a fault apportionment case: their entire case rises and falls on whether Turk was acting in the scope of her employment. *See* Appellants' App., Vol. II at 85 (Plaintiffs' Motion in Limine). Banking that she was, the Stucks sued Franciscan only and alleged that, in the course and scope of her employment with Franciscan, a Franciscan employee posted protected health information about D.S. on a publicly-accessible Facebook page of a local news outlet, causing damages to the Stucks for which

Franciscan is liable via respondeat superior. *See id.* at 24-25. And periodically throughout these proceedings, including in their motion to correct error, the Stucks have attempted to keep Franciscan from asserting that Turk *was not* acting in the scope of her employment. *See id.* at 122 (the Stucks arguing in a motion to reconsider the ruling on their motion in limine that, because it did not name Turk as a nonparty, Franciscan "may not imply, suggest, or allude to misconduct by anyone" other than the parties). And yet the very nature of the Stucks' respondeat superior claim is that Franciscan is liable *because of someone else's misconduct.* Franciscan admitted that a Franciscan employee posted information on Facebook, *see id.* at 30, but it remained the Stucks' burden to prove that the employee's action was negligent *and* that it was done in the scope of her employment, even in the absence of a defense by Franciscan.

[32] Viewing the evidence in the light most favorable to Franciscan, the nonmovant, there is sufficient evidence to support the verdict in Franciscan's favor. Turk's job at Franciscan put her in a place where she could learn some of the information she shared on Facebook, but her job duties in no way involved patient information, the sharing of patient information was strictly prohibited by Franciscan's policies, and Turk shared information that was interpreted to mean something she could not have known through her employment – namely, that D.S. had died. "The jury, as the trier of fact, must weigh the evidence, draw any reasonable inferences, resolve conflicts in the evidence, determine the credibility of witnesses and decide in whose favor the evidence preponderates." *Sandberg Trucking, Inc. v. Johnson*, 76 N.E.3d 178, 183 (Ind. Ct. App. 2017).

There was not a complete failure of proof and the trial court did not error in declining to intervene in the jury's decision.

# Conclusion

[33] The trial court did not abuse its discretion in admitting Franciscan's Exhibit R into evidence, in declining to give the Stucks' tendered instructions purporting to clarify the model instruction about respondeat superior given by the trial court, or in denying the Stucks' motion for judgment on the evidence. Accordingly, the trial court's order entering judgment on the jury's verdict in favor of Franciscan is affirmed.

[34] Affirmed.

Bradford, C.J., and Altice, J., concur.